IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GEURRIER CANTAVE,<br><br>    Defendant. | Criminal Action No. 14-CR-41 (DNH)<br><br>**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO SUPPRESS AND MOTION TO PROVIDE DEFENDANT WITH TRANSPORTATION** |

## OVERVIEW

The defendant seeks to suppress (1) a post-*Miranda* confession and (2) evidence seized from his person, as well as a vehicle he was driving, while attempting to transport an illegal alien from the Canadian border to Boston, Massachusetts on October 26, 2013. The defendant's motion to suppress is without merit, has no factual support, and should be summarily denied. Further, the defendant—who posted a sizeable bond, promised to appear at all future court hearings, and has retained private counsel—is not entitled to compensation for travel expenses, lodging, and meals while he stands trial. If the defendant can no longer afford to adhere to the conditions of his release, which include appearing for trial, he should be remanded into the custody of the U.S. Marshals.

## FACTUAL BACKGROUND

On October 26, 2013, at approximately 12:45 a.m., U.S. Border Patrol observed an individual, later identified as Noelcy Valentin, walking south on Meridian Road, south of the Canadian border. At that time, U.S. Border Patrol was dispatched to the vicinity. One U.S. Border Patrol unit located Valentin walking alone and questioned him about his citizenship. Valentin told U.S. Border Patrol that he was from Haiti and did not have any documents that allowed him to be in the United States. Valentin was arrested at that time and transported to a

nearby U.S. Border Patrol station.  At the time of his arrest, Valentin was in the possession of numerous items, including a cellular phone.  Subsequent database checks showed Valentin was removed from the United States in 1998 and did not have permission to be in the United States on October 26, 2013.

While the first U.S. Border Patrol unit was interacting with Valentin, a second U.S. Border Patrol unit—which was also investigating the event and looking for other aliens and a pick-up vehicle—encountered a vehicle, with Canadian plates, driving extremely slowly along a road known to be regularly used by alien smugglers.  U.S. Border Patrol ran the vehicle's plates and determined the vehicle was a rental from Canada.  U.S. Border Patrol units followed the vehicle for a brief period of time but did not effectuate a stop.  The vehicle, on its own accord, pulled over to the side of the road.  At approximately 12:50 p.m., U.S. Border Patrol pulled up immediately behind the parked vehicle and approached the driver.  The vehicle was occupied by one adult male, later determined to be the defendant, Guerrier Cantave.  The defendant, a native of Haiti, and Canadian citizen, presented a Canadian passport and stated, in intelligible English, that he was in the area looking for gas.  U.S. Border Patrol asked the defendant if he would be willing to follow them to the station so they could talk further.  The defendant agreed, in English, and drove his vehicle back to the U.S. Border Patrol station.

At the station, the defendant acknowledged and waived his *Miranda* rights, in English. The defendant told U.S. Border Patrol, in intelligible English, that he knew Valentin and that he had agreed to meet Valentin inside the United States and give him a ride to Boston in exchange for gas money.  The defendant stated he knew that Valentin did not have a visa allowing him to enter the United States and that Valentin had previously told him that he could not cross the border directly.  The defendant stated that he and Valentin had agreed to contact one another

using cellular phones so the two could locate one another after Valentin entered the United States from Canada on foot.  The defendant stated that, earlier that night, he called Valentin and told Valentin he was leaving for the United States and that it would take him about 45 minutes to cross the border, and that Valentin should call him when he was ready to be picked up.  The defendant further explained that he and Valentin had agreed that the defendant would pick up Valentin at a gas station near an exit off I-87.  At the time of his arrest on October 26, 2013, the defendant had a Kyocera cellular phone on his person and a Tom Tom GPS inside the vehicle.

At the station, Valentin also acknowledged and waived his *Miranda* rights.  Valentin told agents that he knew the defendant, and that he had planned to call the defendant using his cellular phone after entering the United States, alone, on foot.  Valentin explained that the defendant had agreed to drive him to Boston, and that he intended to give the defendant gas money.  Valentin further told agents he had spoken with the defendant over the phone earlier that evening and told the defendant he was "going to take a chance" and cross the border.

## ARGUMENT

**I.    U.S. Border Patrol Had Reasonable Suspicion to Approach the Defendant's Vehicle.**

Under *Terry v. Ohio*, 392 U.S. 1, (1968), a law enforcement officer can effect a "stop" if he or she has a "reasonable suspicion" that criminal activity is taking place.  *Id.* at 30.  Officers are entitled to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *United States v. Cortez*, 449 U.S. 411, 418 (1981).  "Factors that, in light of the officer's experience and training, may give rise to reasonable suspicion include: (1) characteristics of the area where the vehicle is found; (2) its proximity to the border; (3) usual traffic patterns on that road; (4) previous experience with alien traffic in the area; (5) recent

information about specific illegal border crossings there; (6) the driver's behavior, such as attempting to evade officers; (7) characteristics of the vehicle itself; and (8) the appearance of persons in the vehicle, such as mode of dress." *United States v. Singh*, 415 F.3d 288, 294 (2d Cir. 2005).

In this case, the uncontested facts establish that the U.S. Border Patrol had reasonable suspicion that the vehicle driven by the defendant on October 26, 2013 was involved in criminal activity. At the time in question, U.S. Border Patrol was on the lookout for a so-called "pick-up" vehicle in the vicinity because another U.S. Border Patrol unit had apprehended an alien, Noelcy Valentin, walking southward from Canada, just moments before encountering the defendant's vehicle. The vehicle driven by the defendant was acting in a manner consistent with a "pick-up" vehicle; it was driving extremely slowly and then ultimately stopped and pulled over to the side of an empty road for no traffic-related reason. These are erratic, unusual behaviors consistent with a driver looking to locate a pedestrian along the side of the road. The road where the vehicle was located was extremely close to the U.S.-Canadian border, and known by U.S. Border Patrol to be used by alien smugglers to meet and pick up aliens that had crossed into the United States on foot. Further, the vehicle was from Canada, and was determined to be a rental. Alien smugglers are known by U.S. Border patrol to prefer rented vehicles so they do not forfeit their person vehicle if apprehended. Additionally, the unusual behavior occurred late at night in a desolate area known to be a common location for illegal alien crossings. Based on the totality of the circumstances, all of which fall into categories the Second Circuit has recognized as relevant in making an investigatory stop, *see id.*, U.S. Border Patrol had ample grounds to initiate a stop to assess the defendant's activities.

In any event, the defendant was not arrested at that time and no evidence was seized or incriminating statements elicited during the encounter on the road. Thus, even if the stop lacked reasonable suspicion—and it did not—no evidence was obtained as a direct result of the stop. Rather, the defendant was asked by U.S. Border patrol if he would voluntarily travel to a nearby U.S. Border Patrol station for further discussions. The defendant agreed and then, on his own accord, drove his vehicle to a nearby U.S. Border Patrol station and continued his conversation with the U.S. Border Patrol inside the station. It was only after the defendant waived his *Miranda* rights and provided a detailed confession, in intelligible English, about how he arranged to meet Valentin in the United States—knowing Valentin was an alien without papers and intended to cross the border illegally—and then drive him to Boston, that he was placed under arrest and physical evidence seized.

## II. The Defendant's Post-*Miranda* Statements at the Station Are Admissible Because They Were Knowing and Voluntary.

"Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985). However, a defendant need not "know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574, (1987). Rather, a defendant need only be aware that "he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* "Whether a waiver is 'knowing and voluntary' is a question directed to a defendant's state of mind, which can be inferred from his actions and statements." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993).

Voluntariness is assessed under a "totality of the circumstances" approach. *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987). Relevant factors include "the type and

5

length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." *Id.* at 952. Accordingly, voluntariness has been found where:

> (1) [The defendant] was legally an adult; (2) there was no evidence that [the defendant] had below-average intelligence; (3) there was no evidence that [the defendant] was denied food, access to the bathroom, or sleep during his interrogation; (4) [the defendant] was not beaten, otherwise abused, or even handcuffed; (5) the duration of the interrogation did not by itself establish that the statement was involuntary; and (6) "[t]he threat of speaking to [the defendant's relative] is not the type of coercion that, without more, would overbear a normal person's will and cause [him] to confess involuntarily to a double murder."

*Diaz v. Senkowski*, 76 F.3d 61, 65 (2d Cir. 1996).

In this case, the only evidence before the Court is that the defendant was notified of his *Miranda* rights, and then knowingly and voluntarily waived those rights, in intelligible English. *See* Dkt. No. 25-34 at 1 ("Cantave was read his *Miranda* warnings by BPA Michael Sisco. Cantave acknowledged he understood his rights and was willing to make a statement. Cantave verbally acknowledged his *Miranda* rights as witnessed by Agents Sisco and Kennedy and agreed to answer any questions without the presence of legal representation at approximately 2:51 a.m."). Indeed, the Memorandum of Investigation the defendant filed as an exhibit to his motion, *see id.*, establishes that the defendant provided an extremely detailed statement in English. The defendant was also advised of his right to speak to the Canadian Consulate and declined that invitation.

Now, however, the defendant apparently claims—via his attorney in a memorandum of law—that he did not understand his *Miranda* rights and that a language barrier, coupled with his lack of experience with the judicial system, rendered his waiver involuntarily and unknowing.

As an initial matter, none of defense counsel's claims concerning the defendant's capacity to speak English or general understanding of the waiver are supported "by an affidavit, based upon personal knowledge, setting forth facts which, if proven true, would entitle to

6

defendant to relief." *United States v. Elliott*, 363 F. Supp. 2d 439, 445 (N.D.N.Y. 2005); L. R. Cr. P. 12.1(e) (requiring a factual affidavit). As the party seeking to suppress, the defendant bears the burden of production. *See United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980). "If the defendant does not satisfy his burden, there will be no hearing, and the evidence he seeks to suppress will be admitted at trial." *United States v. Miller*, 382 F. Supp. 2d 350, 361 (N.D.N.Y. 2005); *see also United States v. Tudoran*, 476 F. Supp. 2d 205, 217 (N.D.N.Y. 2007) ("Before a defendant is entitled to a suppression hearing and to compel the government to meet its burden of proof, he must meet his burden of production.").

Here, the only information before the Court suggesting that (1) the defendant had a "limited understanding of English" or (2) that his confession was not "knowingly and voluntarily" are bald assertions of defense counsel set forth in a legal memorandum. No individual with personal knowledge has supplied an affidavit setting forth facts which, if true, would prove that the defendant has a limited understanding of English or that his confession to U.S. Border Patrol was not knowing and voluntary. The defendant has not met his burden of production with respect to these claims, nor has he complied with the dictate of Local Rule 12.1(e), and therefore the defendant is not entitled to a hearing.

But even if the defendant had satisfied his burden of production, the defendant concedes that he does speak English. The two exhibits filed by the defendant, see Dkt. No. 25-3 and 25-4, establish that the defendant provided an extremely detailed statement to U.S. Border Patrol, in English. The statement encompassed details about his personal background, including when and where he was born, his life in Haiti, his subsequent immigration to Canada, his employment history, his romantic history, how he came to know Valentin, Valentin's immigration status, what Valentin told him about his need to enter the United States, and the details of his

7

arrangement with Valentin to provide a ride to Boston.  The statement provided by the defendant belies defense counsel's unsupported assertion that the defendant's limited English comprehension precluded him from giving a knowing and voluntary waiver of his *Miranda* rights.

In the Second Circuit, "a lack of fluency in English does not automatically preclude a defendant from executing a knowing and voluntary waiver of rights in that language." *United States v. Ocasio*, 80 Fed. App'x 127, 129 (2d Cir.2003) (citations omitted); *see also United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (defendant gave knowing and voluntary waiver where he had "a reasonably good command of the English language"); *United States v. Ghafoor*, 897 F. Supp. 90, 91 (S.D.N.Y. 1995) (waiver was valid where, *inter alia*, defendant indicated he spoke English, claimed to understand his *Miranda* rights, responded to requests for pedigree information, made a specific statement regarding the offense, and never asked the law enforcement officer to repeat questions); *United States v. Yian*, 1995 WL 422019, at *2–4 (S.D.N.Y. July 18, 1995) (defendant's English was sufficient to make a knowing waiver where did not indicate a lack of understanding and was able to converse with English-only speakers).

For the reasons set forth above, a preponderance of the evidence establishes that the defendant was Mirandized properly, that he had a command of English sufficient to understand his *Miranda* rights and the consequences of his waiver, and that he knowingly, intelligently, and voluntarily waived his rights.

## **CONCLUSION**

The defendant's motion to suppress and request for non-custodial transportation to future court proceedings should be denied.

Dated: May 9, 2014                                        Respectfully submitted,

                                                        RICHARD S. HARTUNIAN
                                                        United States Attorney
                                                        Northern District of New York

By: _____
                                                       Wayne A. Myers
                                                       Assistant United States Attorney